[No. 2889.]

## BILL BASS v. THE STATE.

·1. RAPE-EVIDENCE—THREATS.—The indictment charged that the rape was committed by force, and did not include a count that it was effected by threats. The State was permitted to prove that when the injured party attempted to give the alarm, the defendant placed his hand over her mouth, and commanded her to desist on pain of death. To this evidence the defense objected, because force was the only means alleged in the indictment. But *held*, that the evidence was admissible; first, because it was *res gestæ;* second, because it bore directly upon the question of consent; third, because it showed the intent of the assailant; and fourth, because it was an important fact to be considered in passing upon the character and degree of force used by defendant to accomplish his purpose.

2 SAME.—With regard to force, in the perpetration of rape, the statute, Article 529 of the Penal Code, requires that it shall be such as might reasonably be supposed to be sufficient to overcome resistance, taking into consideration the relative strength of the parties, and other circumstances in the case. In determining upon the sufficiency of the force used, the jury is authorized to take into consideration threats made at the time of the commission of the offense. *Sharp* v. *The State*, 15 Texas Court of Appeals, 171, cited and approved.

3. SAME—FACT CASE.—See evidence held sufficient to support a capital conviction for rape

4. PRIVILEGE OF COUNSEL.—Even when it is apparent that prosecuting counsel assumed and commented, in argument, upon a fact not in proof, this court will not, for that reason alone, reverse a conviction, unless it is made clearly to appear that such conduct was calculated to prejudice the rights of the defendant.

APPEAL from the District Court of Lamar. Tried below before the Hon. R. R. Gaines.

The conviction in this case, whereby the appellant was awarded the death penalty, was predicated upon an indictment which charged him with the rape of Lou Williams, an inmate of the Lamar county poor farm, in Lamar county, Texas, on or about the twenty-first day of October, 1883.

Mary Curtis was the first witness introduced by the State. She testified that she knew the defendant, and pointed him out in court. She saw the defendant at the Lamar county poor farm,

where he had been staying, on or about the twentieth day of October, 1883. He came to the city of Paris on that day. The witness again saw him on that day, between the hours of eight. and nine p. m., in the room of Lou Williams, in the house situated on the said poor farm. Lou Williams is a paralytic. The witness heard Lou Williams calling as though she was smothering, and, taking her oldest child and a lamp, witness went into Lou Williams's room. When she got into the room she saw the defendant in bed with, and lying upon top of Lou Williams, having her clothes pulled up. Lou Williams was fighting the defendant with both hands. The witness called Mr. Chambers three different times before the defendant moved from the bed. When he did so he attempted to hide his face with a quilt. He went out of the room holding his hands before him, as though he was holding his clothes up. Lou Williams immediately complained to witness, and told her what had taken place. The defendant came back after all this occurred, but witness did not see him again that night. Chambers and Pursell were on the place at the time of this occurrence, and Mr. Bates came soon after. The defendant had been on the place about two months. Witness lived on the poor farm. Lou Williams is about twenty-one years of age.

Cross-examined, the witness stated that she had retired when Lou Williams gave the alarm. This was between eight and nine o'clock—not later perhaps than half-past eight—on a Sunday night. The house in which the offense was perpetrated had double rooms with a stack chimney between them. There were doors in the north and south sides of the house, but none in the partition. Lou Williams was in the west, and the witness in the east room, adjoining. Witness slept in the east extreme of her room, and Lou Williams slept in a bed that stood in the centre of her room. Lou made no other outcry than to call the witness by name, though she made a noise like she was smothering. The witness got up immediately, lit a lamp, went into Lou's room, and discovered the defendant as stated, and being much excited she stepped instantly to the door and called Mr. Chambers. Defendant left the room after witness had called Chambers three times. About two minutes elapsed before Chambers arrived. The defendant went out at the north door, his back toward witness and with his hands in front of him. The witness was on the south side gallery when she saw the defendant on top of Lou Williams. His head was toward the

witness when he attempted to cover it with the quilt. Witness next saw the back of the defendant only as he went out at the door. He said nothing that the witness heard. He wore a hat and coat.

The defendant was at breakfast the next morning at the usual time, which was the first time the witness saw him after he left Lou Williams's room. Lou and Chambers were at breakfast at the same time. The defendant went about his work after he got his breakfast. About two minutes after he ran out of the room in which he had assaulted Lou Williams the defendant returned and called for his supper, which witness refused to give him. Witness heard but did not see him at this time. No one was at the house at the time of the assault besides Lou and defendant except witness, her children and a crazy woman. Chambers had been there, but had gone to the house occupied by him. When witness refused to give the defendant his supper, he left, saying that he was going to bed. Mr. Chambers did not see the defendant in Lou's room. The defendant tried to pull the quilt over his face and hide it, but in this he did not succeed. As soon as the witness saw the man on Lou, she recognized him as the defendant.

The room in which Lou Williams slept was of good size, and contained three beds. The door was partly open when the witness went in. Witness approached the bed at the head, and got within nine feet of the defendant. His face was turned down, but not against Lou's, nor too far down for witness to see his whole face. The girl was fighting him, and he seemed to be attempting to protect his face. Witness knew his clothes, including the coat, which was the same he was now wearing. Witness identified the defendant by his face, which she saw as she went into the room. Defendant did not look back on his way out of the room, and during his passage out the witness saw only his back. The witness heard him as he came from town just before he made the assault on the girl. As he went into the house he was whistling, by which means she recognized him. She also knew him by his walk. Some three or four minutes after he came home whistling the alarm was given.

Lou Williams was the next witness for the State. She testi·fied that she knew the defendant, and pointed him out in court. He came into the witness's room on the poor farm one night during the month preceding this trial, got in bed with and on top of witness, and, when witness called out in alarm, which

she did immediately, he put his hand over witness's mouth and told her that if she hallooed he would kill her. He then pulled the witness's clothes up, her legs apart, and inserted his private parts into her private parts. He laid on the witness about five minutes, and accomplished his purpose without the consent of the witness.

On cross-examination, the witness stated that it was dark in her room when this outrage upon her was perpetrated, and she could not see until the lamp was brought in, but she knew that the defendant was the man who outraged her. She knew him by his voice, although he spoke in a whisper, and she had never before heard him whisper. Witness felt his head in the struggle. He had on an old black hat. The witness knew him before the light was brought into the room. When he first got into the bed witness thought it was old "Aunt Sallie," and kicked him twice. He put his hand over witness's mouth before he pulled up her clothes. He then said he would kill her if she called out. About a minute later, Mrs. Curtis came in. Witness knew for another reason that defendant was her assailant—no other negro knew where she slept. Two or three negroes took dinner with defendant a day or two before this.

Freeman Purcell was the next witness for the State. He testified that he was living on the Lamar county poor farm on the twentieth day of October, 1883. He did not see the defendant on the Sunday of the alleged rape. Between eight and nine o'clock that night he heard some one, who appeared to have just come from town, getting over the poor farm fence, and asked who it was, and was answered: "It is me, Bill." The defendant then came up to witness and asked witness what was the occasion of the commotion at the other house. Witness replied that he did not know. He replied that he would go and see—that he wanted his supper, anyway. He shortly returned to the house occupied by witness and said that the parties at the other house accused him of creating the disturbance. Witness went into his house, lighted a lamp, and advised the defendant not to leave. He replied that he was not guilty of anything and would not run off. Witness started off, but was called back by defendant to extinguish the lamp. Defendant was at the poor farm next morning. The house occupied by the witness and the defendant stood northwest of that occupied by Lou Williams. When first accosted by the witness on the night of the alleged rape, he, defendant, said that he had just come from town.

E

Cross-examined, the witness stated that when he first heard the defendant on the night in question he, defendant, was or seemed to be coming across the Latimer field, from the direction of town. Witness went to Mr. Bates's house, and Bates returned with him, but said nothing. Witness knew of nothing that the Irishman told defendant when the latter went back to the house occupied by Lou Williams and Mrs. Curtis, to get his supper. Witness did not remember whether defendant wore a hat or cap on that night. He did not know that defendant owned a cap. He owned two hats.

James Bates was the next witness for the State. He testified that he was in charge of the Lamar county poor farm. The defendant lived there on or about Sunday, October 20, 1883. The defendant was not on the farm on that day after ten or eleven o'clock in the morning. His practice was to go to town every Sunday, and two or three nights in every week. The witness saw and spoke to Lou Williams on that Sunday night, after the alleged rape. She was crying at that time. Two crazy women, one very deaf, usually occupied the room with Lou Williams. The witness saw the defendant that night, at which time he had on a small black hat. A party going the front way from the house occupied by Lou Williams to that occupied by Purcell would have to go through a gate or scale a fence. A horse lot stood between the two houses, and parties passing between them sometimes went around the horse lot.

Cross-examined, the witness stated that a lane ran east and west between the D. F. Latimer field and the poor farm. All of the houses on the farm belong to the county, and stand about seventy-five yards apart. Witness did not remember whether or not the defendant had on a coat. He was dressed then very much as he was dressed on this trial, except that he wore a small black hat. He said that he had been to Mrs. Curtis for his supper, which she refused to give him.

County physician Bullett testified, for the State, that Lou Williams, the alleged injured party, was a paralytic, and had very little use of her limbs.

Mary Curtis, recalled for the State, testified that she saw the defendant on the morning of the day of the alleged outrage. He wore a cap when he said that he was going to town. When he returned that night he had on a hat.

Cross-examined, the witness stated that the defendant came to Lou Williams's room that night from the direction of town.

If he went to his own room at all, the witness did not know it. The witness only saw him that night in Lou's room. She heard but did not see him when he asked for his supper. She heard him ask Mr. Bates why the witness would not give him his supper. After she had refused to give him supper, she heard him talking to the Irishman at the wood pile, but could distinguish nothing he said.

James Bates, being recalled by the State, testified that no negro other than the defendant staid on the Lamar county poor farm at the time of the alleged offense. Defendant said to the witness that night, after the discussion of the affair began, that he did not know what to do. Witness told him that if he had done nothing he ought to go to bed.

Cross-examined, the witness said that the defendant called him out of his house that night and told him that Mrs. Curtis would not give him his supper—that she had even refused him cold victuals. Witness told him of what the people at the house accused him. The defendant went about his customary work next morning.

James Yates testified, for the State, that he arrested the defendant on the morning after the alleged rape, and confined him in jail. Witness found the defendant in the woods of the poor farm, chopping a log. This was two or three miles from the farm, and about the same distance from Paris. He had the county team, and was getting wood. The State closed.

The defense introduced Charles Patterson as the first witness. He testified that he knew the defendant by sight, but not by the name of Bill. The defendant was at Woodson Hughes's, in the city of Paris, between the hours of eight and nine, on the Sunday night of the alleged rape.

Cross-examined, the witness said that he had no watch and only guessed at the time. While he felt confident that he saw the defendant at Hughes's between eight and nine o'clock, he would not positively swear to that hour. It might possibly have been as early as seven o'clock. It was some time after dark.

Ira Williams testified, for the defense, that he saw the defendant at Woodson Hughes's, in Paris, and left him there, some time after dark. He did not know how long after dark this was.

The motion for new trial set up the questions discussed in the opinion.

No brief for the appellant has reached the Reporters

*J. H. Burts,* Assistant Attorney General, for the State.

Hurt, Judge. Appellant was convicted of the rape of Miss Lou Williams, an inmate of the poor farm of Lamar county, and his penalty was assessed by the jury at death. There is no assignment of errors in the record, nor brief filed for appellant in this court.

Three grounds were urged in the motion for new trial in the court below: 1. As the indictment alleged that the rape was effected by force, omitting threats, that the State was confined to this means, and could not legally prove threats made by the defendant at the time of the carnal intercourse.

On the twentieth of October, 1883, at the poor farm in Lamar county, Lou Williams, the prosecutrix, a paralyzed lady of about twenty-one years of age, was in her room in bed. Her room was the west room of a house containing two rooms, the east one of which was occupied by Mrs. Curtis. About eight o'clock at night, some person, whom she at first believed to be her aunt, came to and got on her bed. Immediately, however, on entering the bed, the party placed his hand on the mouth of Miss Williams, and began to pull up her clothes, when she began to "hollow for Mrs. Curtis," whereupon her assailant whispered to her: "If you hollow, I will kill you."

The indictment having selected *force* as the only means by which the rape was effected, had the State the right to prove this threat, made at the time and place stated? Beyond any sort of a doubt this proof was legitimate. First, it was *res gestæ.* Second, it bore directly upon the question of consent. Third, it showed the intent of the assailant. And fourth, it was an important fact to be considered in passing upon the character and degree of force used by defendant to accomplish his purpose.

Article 529 of the Penal Code requires the force to be such as might reasonably be supposed to be sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case. The question is whether, in determining the sufficiency of the *force*, threats can be considered. In *Sharp* v. *The State* (15 Texas Ct. App., 171), decided at the last Tyler term, we held that evidence of threats was not only admissible as *res gestæ*, but could be looked to and

considered by the jury in passing upon the sufficiency of the force used. The reasons enumerated in that opinion we believe to be correct, but whether admissible for this purpose or not, evidently as *res gestæ,* and as evidence tending to elucidate the intention of the assailant, and bearing upon the question of consent, this threat was admissible.

There is no complaint of the charge of the court upon the subject, the learned judge presiding confining the jury in his charge to *force* as the means used by which the rape was effected.

2. Does the evidence support the verdict? We have examined the statement of facts critically and with that earnestness demanded by the terrible penalty imposed by the jury in their verdict, and are forced to the conclusion that, if the witnesses testified the truth, the verdict is amply supported by the evidence. (The Reporter will insert the evidence.)

3. That the argument for the State was not proper. Counsel for the State made some observations to the effect that the prosecutrix, seeing defendant under such circumstances, would not be likely ever to forget his features. This was argument, and whether sound or fallacious, this court will not reverse the judgment. It is contended by the appellant that there is no evidence that the prosecutrix saw the features of defendant, and that therefore these remarks were out of the record. We believe that there is evidence tending to show that the prosecutrix saw the face of defendant; but, suppose we concede that the counsel for the State assumed a fact and commented upon such fact which was not in proof, this court would not reverse the judgment unless such conduct was very clearly calculated to prejudice the rights of defendant. To reverse in all cases in which counsel did not confine themselves to the record would render trials farces. In fact, rare would be the case in which such irregularities would not occur.

We have given to this record our most careful attention, and must say that there is no such error, if there be any, as will authorize us in disturbing the judgment, and it is affirmed.

*Affirmed.*

Opinion delivered April 26, 1884.